******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

COMMISSION ON HUMAN RIGHTS AND
OPPORTUNITIES EX REL. WENDY
PIZZOFERRATO ET AL. *v.* THE
MANSIONS, LLC, ET AL.
(SC 21111)
(SC 21113)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

The plaintiff Commission on Human Rights and Opportunities filed a housing discrimination action on behalf of the intervening plaintiffs, W and R, against the defendants, the owner of an apartment complex, M Co., its managing entity, and its director of operations, alleging that the defendants had discriminated against W and R on the basis of W's disability by constructively denying their request to allow two emotional support dogs to live with them in the apartment complex as a reasonable accommodation. Although M Co. generally prohibited pets at the apartment complex, the defendants agreed to allow W and R to have one dog in their apartment but sought further documentation, including medical records, from W and R to justify the necessity of a second emotional support dog. The trial court rendered judgment for the plaintiffs, concluding, inter alia, that the defendants had discriminated against W and R on the basis of W's disability in violation of the statute **(§ 46a-64c (a) (6))** prohibiting discrimination against persons with a physical or mental disability in the sale or rental of a dwelling. The defendants appealed to the Appellate Court, claiming, inter alia, that the trial court had incorrectly concluded that the requested accommodation for two emotional support dogs was necessary to afford W an equal opportunity to use and enjoy the dwelling insofar as the trial court found only that the defendants "regarded" W as having a disability. The Appellate Court concluded that the trial court, in finding that W was regarded as having a mental disability, also implicitly found that W had a "record of" a disability but nevertheless reversed the trial court's judgment, reasoning that the commission had failed to demonstrate that the second dog was necessary to afford W and R an equal opportunity to use and enjoy the dwelling. On the granting of certification, the commission and the defendants filed separate appeals with this court. *Held*:

Although this court upheld the Appellate Court's reversal of the trial court's judgment, it vacated the Appellate Court's judgment insofar as that court determined that the trial court had implicitly found that W was a person with a mental disability because she had "a record of" having a disability and insofar as the Appellate Court addressed the legal standard for determining whether an accommodation is necessary to afford a disabled individual equal opportunity to use and enjoy a dwelling for purposes of § 46a-64c (a) (6).

The Appellate Court incorrectly concluded that the trial court, in finding that W was "regarded" by the defendants as having a mental disability for purposes of the statute (§ 46a-51 (20)) defining the term "mental disability," also implicitly found that W had "a record of" a mental disability for purposes of § 46a-51 (20).

The trial court unambiguously made a finding that W was "regarded" by the defendants as having a mental disability, and because that court did not make an explicit determination that W had "a record of" a mental disability and because a finding that W had "a record of" a mental disability was not a subsidiary finding necessary to support the trial court's judgment, this court declined to imply such a finding in the trial court's decision.

Moreover, the commission conceded that a finding that W was "regarded" by the defendants as having a mental disability, as opposed to W having "a record of" a disability, was insufficient to support a claim of discrimination on the basis of the defendants' failure to afford W and R a reasonable accommodation.

Accordingly, because W was a person who was only "regarded as" having a mental disability, W and R were not entitled to an accommodation, and the Appellate Court did not need to address whether permitting W and R to have two dogs versus one dog was "necessary" to afford them with an equal opportunity to use and enjoy the apartment complex within the meaning of § 46a-64c (a) (6).

Argued December 5, 2025—officially released March 31, 2026

*Procedural History*

Action to recover damages for, inter alia, alleged housing discrimination, and for other relief, brought to the Superior Court in the judicial district of Tolland, where the court, *Gordon, J.*, granted the motion to intervene as plaintiffs filed by Wendy Pizzoferrato et al.; thereafter, the case was tried to the court, *Huddleston, J.*; judgment for the plaintiffs, from which the defendants appealed to the Appellate Court, *Bright, C. J.*, and *Alvord* and *Keller, Js.*, which reversed the trial court's judgment, and the defendants and the plaintiff Commission on Human Rights and Opportunities, on the granting of certification, filed separate appeals with this court. *Affirmed in part*; *vacated in part.*

*Richard M. Hunt*, with whom was *Maria K. Tougas*, for the appellants in Docket No. SC 21111 and the appellees in Docket No. SC 21113 (defendants).

*Megan Graefe*, human rights attorney, with whom were *Michelle Dumas Keuler*, managing legal director, and, on the brief, *Libby Reinish*, former human rights attorney, for the appellee in Docket No. SC 21111 and the appellant in Docket No. SC 21113 (plaintiff Commission on Human Rights and Opportunities).

*Pamela Heller*, *Jessica Labrencis* and *Dahlia Romanow* filed a brief for the Connecticut Fair Housing Center et al. as amici curiae in Docket No. SC 21113.

*Lynn Estes Calkins*, pro hac vice, and *David J. Santeusanio* filed briefs for the National Apartment Association as amicus curiae in Docket Nos. SC 21111 and SC 21113.

*Erin Kemple* filed a brief for the National Fair Housing Alliance as amicus curiae in Docket No. SC 21113.

*Opinion*

MULLINS, C. J. These certified appeals arise from a housing discrimination action filed by the plaintiff Commission on Human Rights and Opportunities (commission)[1] against the defendants, The Mansions, LLC, 75 Hockanum, Inc., and Candace Barnard.[2] The commission claims that the defendants discriminated against the intervening plaintiffs, Wendy Pizzoferrato (Wendy) and Rudy Pizzoferrato (Rudy), by allowing only one of Wendy's two emotional support dogs to reside with them at the Mansions apartment complex. The trial court found that the plaintiffs established that the defendants had discriminated against the Pizzoferratos by constructively denying their request to waive Mansions' no pet policy in order to allow both dogs

---

[1] The commission brought this housing discrimination action on behalf of Wendy Pizzoferrato and Rudy Pizzoferrato. The Pizzoferratos subsequently intervened as plaintiffs in the action. For ease of discussion, we refer to the commission and the Pizzoferratos collectively as the plaintiffs.

[2] The Mansions, LLC, is the owner of an apartment complex in Vernon. 75 Hockanum, Inc., is the managing entity for The Mansions, LLC, and Barnard is its director of operations. For ease of reference, we refer to 75 Hockanum, Inc., and The Mansions, LLC, collectively as Mansions and to Mansions and Barnard collectively as the defendants.

to live with them as a reasonable accommodation. The Appellate Court reversed the judgment of the trial court, concluding that, although the plaintiffs had established that Wendy had a disability under General Statutes § 46a-51 (20), the trial court incorrectly determined that the second dog was a reasonable accommodation that was necessary to afford her an equal opportunity to use and enjoy the dwelling.[3] See *Commission on Human Rights & Opportunities ex rel. Pizzoferrato* v. *Mansions, LLC*, 231 Conn. App. 121, 143–44, 163–64, 332 A.3d 933 (2025). We affirm the judgment of the Appellate Court, albeit for different reasons.

The Appellate Court opinion details the facts and procedural history of this case; see id., 123–34; which we summarize herein. In 2017, the Pizzoferratos moved into an apartment complex known as Vintage at the Grove (Vintage). Vintage allowed pets but charged a monthly fee for them. At that time, the Pizzoferratos had two dogs, both shih tzus. After moving into Vintage, Wendy learned that Vintage would waive the pet fees if the dogs were emotional support animals. Thereafter, Wendy contacted and met with Maurice LaPointe, a licensed marital and family therapist. LaPointe subsequently provided a certification that Wendy "suffers from moderate anxiety and that her two canines provide relief."

---

[3] The commission and the defendants both appealed from the judgment of the Appellate Court. We granted the commission's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the trial court had applied an incorrect legal standard for determining whether an accommodation is 'necessary' for the use and enjoyment of a dwelling under General Statutes § 46a-64c (a) (6) (C) (ii)?" *Commission on Human Rights & Opportunities ex rel. Pizzoferrato* v. *Mansions, LLC*, 351 Conn. 928, 333 A.3d 1110 (2025). We also granted the defendants' cross petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly conclude that the trial court had correctly determined that [Wendy] had a 'mental disability' within the meaning of . . . § 46a-51 (20)?" Id., 928–29. Although the two appeals were not consolidated, we nonetheless address them in the same decision in the interest of judicial economy because they both share the same facts and procedural history, and our resolution of the defendants' appeal obviates the need to resolve the merits of the commission's appeal.

Vintage accepted LaPointe's certification and waived the pet fees.

In May, 2019, the Pizzoferratos visited Mansions' rental office, looking for a more affordable place to live. They met with two Mansions employees, Victoria Dumeng and Amanda Proto. Dumeng said that she would answer all of their questions. The Pizzoferratos asked whether their two dogs would be a problem, and Dumeng replied, "all you need is a note from your doctor." Although the Pizzoferratos were not interested in the then available apartment unit, Rudy completed a rental application on May 25, 2019, in hopes that another unit would become available in the near future. On his rental application, Rudy identified the two dogs as assistance animals.

In October, 2019, the Pizzoferratos visited Mansions' property again and toured a town house unit that had become available. During this visit, Wendy asked Dumeng again if her two support animals would be a problem considering Mansions' no pet policy. Dumeng again explained that Wendy only needed to provide a note from her doctor. Wendy and Rudy each submitted a separate online rental application, and the applications were accepted by Dumeng and processed by Proto. On his application, Rudy completed the section requesting the applicant to list and describe any pets. He listed the two dogs and checked a box indicating that they were assistance animals. He also provided their names, ages, breed and weights. After submitting the rental applications, the Pizzoferratos gave notice to Vintage that they would be leaving their Vintage apartment by December 22, 2019.

On October 23, 2019, Wendy obtained a "Request for Accommodation" form from Mansions. Paragraph 7 of the form read as follows: "For requests related to emotional support or therapy animals only: _____'s (name of patient) animal, a _____ (species and breed), provides emotional support that alleviates the listed symptoms of _____'s (name of patient) mental impairment. (List the symptoms): _____." Wendy provided the form to

LaPointe to fill in the necessary information. LaPointe completed the form, writing "Ms. Pizzoferrato" for name of patient, shih tzu for species and breed, and "panic attacks" for symptoms.

On October 24, 2019, Wendy submitted the completed accommodation request form to Mansions. Dumeng then forwarded the accommodation request to the attorney who advises Mansions on fair housing issues. The attorney approved the request. Proto emailed the Pizzoferratos on October 25, 2019, and informed them that their rental applications had been accepted and instructed them on how to access and sign their lease electronically. The Pizzoferratos then signed and submitted the lease documents. Thereafter, on October 26, 2019, Dumeng informed Wendy that her accommodation request had been approved and attached an "Animal Addendum" and a "Support or Service Animal Amendment to Animal Addendum" for the Pizzoferratos to complete. Rudy completed the forms and returned them to Mansions. The completed forms identified the same two dogs that Rudy had identified on his rental application.

After receiving the Pizzoferratos' completed forms, Dumeng noticed that the "Animal Addendum" listed two dogs, whereas the accommodation request form completed by LaPointe indicated that the Pizzoferratos had only "*a*" shih tzu. (Emphasis added.) Dumeng again sought advice from Mansions' attorney, who advised her to notify Wendy that Mansions would be able to accept the one dog that was identified on the accommodation request form as an exception to their no pet policy, but not the second dog. Dumeng emailed Wendy on November 1, 2019, to relay that information to her. The email provided in relevant part: "We approved your request for accommodation based on information from [LaPointe] indicating you needed one dog as an emotion[al] support animal to mitigate the symptoms of your anxiety. There was no indication that you needed two dogs. We will permit the one emotional support dog as an exception to our no pets policy, but not the other."

Before she had read that email, Wendy went to the Mansions' office to provide copies of the dogs' vaccination records and dog licenses, which she had obtained at Mansions' request. At that point, Dumeng notified Wendy of the email and that proof of the need for the second dog was necessary for Mansions to approve that dog's residency on the property. In response, Wendy asked Rudy to provide Mansions with a copy of the accommodation form that LaPointe had provided to Vintage. Rudy emailed that form to Mansions. Dumeng then forwarded the form to Mansions' attorney, asking him to review the form and to advise her on how to proceed.

According to Mansions' activity log, on November 6, 2019, Mansions' attorney advised Dumeng that "we have a few different ways to go about this, depending on if we [want] to lose the resident or possibly incur a complaint." Dumeng then passed the matter to Mansions' director of operations, Barnard, who had been absent from the office when the Pizzoferratos submitted their rental applications, their accommodation request, and other documents.

On that same day, Barnard sent the following email to Wendy: "Good morning, Wendy, [Dumeng] passed your file to me for review. As [Dumeng] stated in her prior email, the first animal has been approved. As far as the second dog, we would need additional information in order to consider it because the document [you] provided from . . . LaPointe does not constitute reliable evidence of a disability related need for a second emotional support dog. In order to consider allowing the second dog, we will need for . . . LaPointe to provide the following:

"An explanation, on [his] letterhead, of why your anxiety requires not one, but two emotional support animals, along with a reference to scientific studies or papers justifying the conclusion that two animals will better control your anxiety than one.

"An explanation of why [the accommodation request form] mentioned only a single emotional support animal.

"A statement, based on [his] sessions with you, of how frequently your anxiety is so acute [that] you cannot leave your apartment.

"In addition, we need to know . . . whether you take one or both of your dogs with you to work on a daily basis.

"Once you provide this additional information, we will evaluate your request for accommodation with respect to a second dog."

The Pizzoferratos interpreted this email as indicating that the defendants did not want them as tenants. Wendy thought that the defendants were requesting her private information in the form of LaPointe's treatment notes. Rudy believed that providing the requested information would be futile because the defendants would just come up with more requests insofar as they did not want the Pizzoferratos as tenants. The Pizzoferratos had already given notice that they were terminating their lease at Vintage, effective December 22, 2019, which gave them only a few weeks to find alternative housing.

On November 8, 2019, Wendy replied to Barnard's email, describing Barnard's actions as "vile and evil" and violative of both fair housing and health privacy laws. She requested a refund of all the money that the Pizzoferratos had paid to Mansions. On November 12, 2019, Mansions cancelled the lease. Mansions also refunded all of the money that the Pizzoferratos had paid. Eventually, the Pizzoferratos located alternative housing.

Pursuant to General Statutes (Supp. 2020) § 46a-82, the Pizzoferratos filed a discriminatory practice complaint with the commission. After an initial investigation, the commission found that there was reasonable cause to believe that the defendants had committed a discriminatory practice, and both the Pizzoferratos and the defendants elected a civil action in lieu of an administrative hearing pursuant to General Statutes § 46a-83 (g) (2). Thereafter, the commission filed the present action against the defendants, alleging that they had discriminated against the Pizzoferratos on the basis

of Wendy's disability by, among other things, denying their request for a reasonable accommodation, namely, their request to allow two emotional support dogs to reside with them at the Mansions property, in violation of General Statutes § 46a-64c (a) (6).[4]

The case proceeded to trial, after which the trial court issued a memorandum of decision. In its decision, the court explained that, in order for the plaintiffs to succeed on their failure to accommodate claim, they had to establish that "(1) [Wendy] is disabled within the meaning of the [federal Fair Housing Act, 42 U.S.C. § 3601 et seq.], (2) [s]he requested a reasonable accommodation, (3) the requested accommodation was necessary to afford [her] an opportunity to use and enjoy [her] dwelling, and (4) the defendants refused to make the accommodation." (Internal quotation marks omitted.) The court further explained that the definition of disability under the Fair Housing Act includes the definition of "mental disability" under § 46a-51 (20).[5] Section 46a-51 (20) provides: "'Mental disability' refers to an individual who has a record of, or is regarded as having one or more mental disorders, as defined in the most recent edition of the American Psychiatric Association's 'Diagnostic and Statistical Manual of Mental Disorders'" (DSM-5). The court stated that the plaintiffs claimed that Wendy was disabled within the meaning of the Fair Housing Act because (1) she has a record of having generalized anxiety disorder, a recognized diagnosis under the DSM-5, and

---

[4] General Statutes § 46a-64c (a) (6) provides in relevant part: "(C) For purposes of this subdivision, discrimination includes . . . (ii) a refusal to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford [a person with a physical or mental disability] equal opportunity to use and enjoy a dwelling . . . ."

[5] Connecticut's fair housing laws prohibit landlords from discriminating against persons with a "physical or mental disability . . . ." General Statutes § 46a-64c (a) (6) (C) (i). "Physical or mental disability" includes, but is not limited to, "a handicap as that term is defined in the Fair Housing Act." General Statutes § 46a-64b (8); see 42 U.S.C. § 3602 (h) (2024). The trial court applied a second definition of "mental disability" found in § 46a-51 (20), which also applies to fair housing claims.

(2) the defendants regarded her as having a disability.[6] See footnote 5 of this opinion.

The trial court explained that "the definition of 'mental disability' in § 46a-51 (20) is not limited to persons who have a mental disorder as defined by the DSM but includes any individual 'who has a record of, or is regarded as having one or more mental disorders,' as defined in the DSM." (Emphasis omitted.) Ultimately, the court found that "[t]he plaintiffs met their burden of proving that [Wendy] was 'regarded as' having a disability and, thus, was disabled within the terms of both [General Statutes] § 46a-64b (8), which incorporate[s] 42 U.S.C. § 3602 (h), and § 46a-51 (20)."

Having found that Wendy was a person with a mental disability because the defendants "regarded" her as having one, the trial court then considered whether the plaintiffs had "established that granting an accommodation for two dogs was necessary for [Wendy's] use and enjoyment of the dwelling." (Emphasis omitted.) The court ultimately was "persuaded that each dog ameliorated one or more of the symptoms of [Wendy's] anxiety disorder and, in that sense, each was necessary for her equal use and enjoyment of the dwelling . . . ." Finally, the court found that the defendants had constructively denied the Pizzoferratos' request for a reasonable accommodation through Barnard's November 6, 2019 email request. As a result, the court found that the defendants had discriminated against the Pizzoferratos on the basis of Wendy's disability, in violation of § 46a-64c (a) (6).

The defendants appealed from the judgment of the trial court to the Appellate Court, claiming that the trial court had incorrectly concluded that the requested

---

[6] As the Appellate Court aptly noted, at the trial court, the defendants did not challenge the applicability of the definition of "mental disability" in § 46a-51 (20). See *Commission on Human Rights & Opportunities ex rel. Pizzoferrato* v. *Mansions, LLC*, supra, 231 Conn. App. 131 n.5. We further observe that the plaintiffs did not claim at any point that Wendy's mental disability substantially limited one or more of her major life activities and therefore qualified as a "handicap" under the federal Fair Housing Act. 42 U.S.C. § 3602 (h) (1) (2024).

accommodation for two emotional support dogs was necessary to afford Wendy an equal opportunity to use and enjoy the dwelling when the court found only that the defendants regarded her as having a disability. See *Commission on Human Rights & Opportunities ex rel. Pizzoferrato* v. *Mansions, LLC*, supra, 231 Conn. App. 122–23, 135–36. The Appellate Court agreed with the defendants that a plaintiff who is only "regarded as" having a disability cannot establish the related need for an accommodation. Id., 142. The Appellate Court, however, examined the trial court's decision and concluded that the court, in addition to finding that Wendy was "regarded as" having a disability, implicitly found that she had a "record of" a disability. Id., 140–41.

As a result of its conclusion that the trial court had implicitly found that Wendy had a record of a disability, the Appellate Court went on to consider whether the plaintiffs had established that the requested accommodation for two emotional support dogs was necessary to afford Wendy an equal opportunity to use and enjoy the dwelling. See id., 144–64. In doing so, the Appellate Court concluded that "the plain meaning of 'necessary' requires that the accommodation be essential to the equal enjoyment of the dwelling, 'not just preferable.'" (Emphasis omitted.) Id., 159, quoting *Vorchheimer* v. *Philadelphian Owners Assn.*, 903 F.3d 100, 107 (3d Cir. 2018). Applying that interpretation to the facts, the Appellate Court concluded that the plaintiffs had failed to prove that the second dog was necessary and, thus, reversed the judgment of the trial court. See *Commission on Human Rights & Opportunities ex rel. Pizzoferrato* v. *Mansions, LLC*, supra, 231 Conn. App. 159–64.

On appeal to this court, the defendants argue, inter alia, that the Appellate Court erred when it concluded that the trial court implicitly found that Wendy had a "mental disability" under § 46a-51 (20) because she had a "record of" a mental disorder, as defined in the DSM-5. The defendants assert that the trial court never found that Wendy had a record of a mental disorder. The

commission responds that the Appellate Court correctly concluded that the trial court had implicitly found that Wendy had a "record of" a mental disorder, as defined in the DSM-5. We agree with the defendants.

A review of the trial court's memorandum of decision reveals that it recognized that the plaintiffs pursued two alternative avenues through which to establish that Wendy was a person with a disability for purposes of § 46a-64c (a) (6). As noted previously, the plaintiffs claimed that (1) the evidence demonstrated that Wendy has a record of having generalized anxiety disorder, a recognized diagnosis under the DSM-5, and (2) the fact that Mansions granted the accommodation request for one dog establishes that Wendy was "regarded as" having a disability.

The trial court's opinion also reflects that it considered as central to this case the issue of whether Wendy was "regarded as" having a disability. The court explained that "[t]he defendants contend that this is not a 'regarded as' case. The plaintiffs, however, have consistently argued that [Wendy] is disabled within the meaning of the statute because [Mansions] treated her as disabled when they granted the accommodation for one dog. This is the essence of a 'regarded as' claim."

The trial court further explained that "[c]ourts have recognized that a plaintiff who is not actually disabled may nevertheless qualify as a person with a handicap under [the Fair Housing Act, 42 U.S.C. § 3602 (h) (3)], if the defendant mistakenly believed the plaintiff to have such a handicap and treated the plaintiff accordingly." (Internal quotation marks omitted.) See, e.*g.*, *Matarese* v. *Archstone Pentagon City*, 795 F. Supp. 2d 402, 434 (E.D. Va. 2011), aff'd in part and vacated in part on other grounds sub nom. *Matarese* v. *Archstone Communities, LLC*, 468 Fed. Appx. 283 (4th Cir. 2012). The trial court further stated that, "[i]n this case, even if [Wendy] does not have a mental impairment that substantially limits one [or] more of her major life activities, she has been treated as having a disability by Mansions,

which accepted her claim of disability and granted her accommodation request." The court ultimately concluded that, "[b]ecause [Mansions] treated [Wendy] as having a disability when they granted her accommodation request, the plaintiffs have proved that [Wendy] was a person with a mental disability within the meaning of § 46a-51 (20)."

Based on the foregoing, the present appeal presents two issues for our resolution. First, the defendants claim that the Appellate Court incorrectly concluded that the trial court implicitly found that Wendy had a "record of" a mental impairment. Second, the defendants argue that, although the plaintiffs may have satisfied their burden of demonstrating that Wendy was "regarded as" having a disability, as a matter of law, the plaintiffs cannot establish a failure to accommodate on that basis.

Whether the Appellate Court correctly determined that the trial court had implicitly found that Wendy had a record of a mental impairment requires us to construe the judgment of the trial court. The interpretation of a judgment presents a question of law, which we resolve by examining the trial court's memorandum of decision and the circumstances surrounding the rendering of its judgment for purposes of determining the court's intention. See, e.g., *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, 320 Conn. 332, 355, 133 A.3d 402 (2016). "As an issue of law, [t]he interpretation of a [trial court's] judgment may involve the circumstances surrounding the making of the judgment. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment . . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The judgment should admit of a consistent construction as a whole. . . . To determine the meaning of a judgment, we must ascertain the intent of the court from the language used and, if necessary, the surrounding circumstances." (Internal quotation marks omitted.) Id.

This court has consistently interpreted trial court decisions in a manner so as to imply subsidiary findings

when those findings are necessary to support the court's judgment. See, e.g., *O'Brien* v. *O'Brien*, 326 Conn. 81, 113–14, 161 A.3d 1236 (2017) ("[w]hen . . . a trial court makes an ultimate finding of fact, we presume, in the absence of evidence to the contrary, that the court also made the subsidiary findings necessary to support its ultimate finding"). No such implication can be made in this case, however, because a finding that Wendy had a "record of" a disability is not a subsidiary finding necessary to support the trial court's judgment. Instead, a finding that Wendy had a "record of" a disability is an independent, alternative means by which the plaintiffs could have established that Wendy was a person with a disability under state fair housing laws.

The Appellate Court reasoned that, "[i]n finding that Wendy was disabled within the meaning of [the] state fair housing laws, the [trial] court concluded that LaPointe's diagnosis of generalized anxiety disorder, although incomplete in some respects, constituted a record of Wendy having a mental disorder defined in the most recent edition of the DSM. . . . Given [the trial court's] analysis regarding LaPointe's diagnosis and the defendants' challenges thereto, coupled with the [trial] court's continued references to the 'record of' prong in § 46a-51 (20), [the Appellate Court] read the [trial] court's decision as finding that Wendy has a record of having generalized anxiety disorder as defined in the DSM." *Commission on Human Rights & Opportunities ex rel. Pizzoferrato* v. *Mansions, LLC*, supra, 231 Conn. App. 139–41.

Although we agree that the trial court made comments addressing LaPointe's diagnosis, we disagree with the Appellate Court that the trial court "concluded that LaPointe's diagnosis of generalized anxiety disorder . . . constituted a record of Wendy having a mental disorder defined in the most recent edition of the DSM." Id., 139–140. Instead, our review of the trial court's memorandum of decision leads us to conclude that the court addressed LaPointe's diagnosis, not as a separate finding that the plaintiffs established that Wendy had

a "record of" a disability, but, rather, to supply a basis for why the defendants regarded her as a person with a disability. Indeed, the trial court expressly stated that "the accuracy of [LaPointe's] DSM diagnosis is not the dispositive issue. . . . [T]he definition of 'mental disability' in § 46a-51 (20) is not limited to persons who have a mental disorder as defined by the DSM but includes any individual 'who has a record of, or is regarded as having one or more mental disorders,' as defined in the DSM. Because [Mansions] treated [Wendy] as having a disability when they granted her accommodation request, the plaintiffs have proved that [Wendy] was a person with a mental disability within the meaning of § 46a-51 (20)." (Emphasis omitted; footnote omitted.)

This language convinces us that the trial court did not view LaPointe's diagnosis of generalized anxiety disorder as a basis for a finding that Wendy had "a record of" a disability, especially insofar as the trial court indicated that the accuracy of LaPointe's determination was not dispositive. But, more to the point, the court used LaPointe's testimony to support its finding that the defendants were aware of that diagnosis and that they treated her, which is to say regarded her, as having a disability. Additionally, the court's decision also reflects that it acknowledged that the plaintiffs could have established that Wendy had a mental disability for purposes of the state fair housing laws by showing either that she had "a record of" or was "regarded as" having a disability and that the court only made a finding that she was "regarded as" having a disability.

In construing the trial court's memorandum of decision, we conclude that the court unambiguously made a finding that Wendy was "regarded as" having a disability by the defendants. The plaintiffs argued that Wendy had a "record of" a disability but that the court did not reach or decide that alternative ground. Because the memorandum of decision does not contain an explicit determination that Wendy had a "record of" a disability and a finding that she had a "record of" a disability is not a subsidiary finding necessary to support the court's

decision, we will not read the court's judgment to imply such a finding. See, e.g., *DeCicco* v. *Dynata, LLC*, 354 Conn. 51, 58–59, 349 A.3d 7 (2026) ("As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment." (Internal quotation marks omitted.)). In sum, given that the trial court expressly recognized that the plaintiffs were presenting two alternative means of proving that Wendy was an individual with a disability under § 46a-51 (20) and the fact that the court only made a finding that Wendy was "regarded as" having a disability, we will not read anything more into the judgment of the court.

Having concluded that the trial court did not implicitly find that Wendy was a person with a mental disability because she had a "record of" having a disability, we are left with the court's finding that she was "regarded as" having a disability. The defendants argue that this finding is insufficient to support a claim of discrimination for failure to make a reasonable accommodation.

On this point, the Appellate Court explained: "[A] plaintiff who does not suffer from a disability cannot establish a disability related need for an accommodation based solely on a landlord's mistaken belief that the plaintiff suffered from a disability. For example, a plaintiff who was mistakenly regarded as being blind by a prospective landlord could not establish that the landlord's refusal to allow him to move in with his dog to assist him in navigating the apartment constituted an illegal failure to accommodate because there is no disability giving rise to the need for the dog. . . . Accordingly, although the 'regarded as' prong is necessary to preclude landlords from refusing to rent to prospective tenants because of perceived disabilities, a perceived disability does not give rise to the need for a reasonable accommodation." (Citation omitted.) *Commission on Human Rights & Opportunities ex rel. Pizzoferrato* v. *Mansions, LLC*, supra, 231 Conn. App. 142–43.

The commission has not challenged this conclusion by the Appellate Court on appeal. At oral argument before this court, counsel for the commission conceded that, "if . . . it is just a 'regarded as' disability, that would not support a request for accommodation."[7] In the absence of any dispute among the parties on this point, we leave for another day the issue of whether a person who is only "regarded as" having a disability can ever be entitled to a reasonable accommodation. Under the circumstances of the present case, with no disagreement among the parties that a person who is only "regarded as" having a disability is not entitled to a reasonable accommodation, we conclude that Wendy was not entitled to an accommodation.

In light of the foregoing, the Appellate Court did not need to address whether permitting Wendy to have two dogs, rather than one, was "necessary" to afford her an equal opportunity to use and enjoy the apartment within the meaning of § 46a-64c (a) (6) (C) (ii). Because we do not reach these two issues in these appeals, and because allowing the Appellate Court's resolution of those issues to remain in place could spawn legal consequences; see, e.g., *State* v. *Boyle*, 287 Conn. 478, 487–90, 949 A.2d 460 (2008); we vacate the judgment of the Appellate Court insofar as it addresses the "record of" prong of § 46a-51 (20) and the legal standard for determining whether an accommodation is "necessary" to afford a disabled person equal opportunity to use and enjoy a dwelling under § 46a-64c (a) (6) (C) (ii).

The judgment of the Appellate Court is affirmed insofar as it reversed the judgment of the trial court; the judgment of the Appellate Court is vacated

[7] The following colloquy occurred at oral argument between this court and counsel for the commission:

"The Court: Do you agree that, if there was simply a . . . finding [that Wendy was] regarded [as having a] disability under our statute . . . that finding would not support an accommodation?

"[The Commission's Counsel]: [I]t's our position that, if . . . it is just a 'regarded as' disability, that would not support a request for accommodation."

insofar as it addresses the "record of" prong of § 46a-51 (20) and the legal standard of what constitutes "necessary" for purposes of the state fair housing laws.

In this opinion the other justices concurred.